UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

NALANAIE H. GUIDRY                         DOCKET NO. 12-CV-3150
on behalf of C.N.H. (a minor)

VERSUS                                     JUDGE DOHERTY

CAROLYN COLVIN, ACTING                     MAGISTRATE JUDGE HANNA
COMMISSIONER OF THE SOCIAL
SECURITY ADMINISTRATION

## REPORT  AND  RECOMMENDATION

Before the court is an appeal of the Commissioner's finding of non-disability.

Considering the administrative record, the briefs of the parties, and the applicable

law, it is recommended that the decision of the Commissioner be REVERSED and

REMANDED for consideration of additional evidence.

### PROCEDURAL BACKGROUND

On March 30, 2010 [Tr. 94[1]], Nalanaie H. Guidry filed an application for

Supplemental Security Income benefits for/on behalf of C.N.H., born July 24, 1995,

a child under the age of 18 at the time of filing of the application. The application for

benefits alleged that the minor child suffered from "epilepsy and anxiety disorders,"

with an alleged disability onset date of January 1, 2010. [Tr. 40-42].

---

[1]The administrative record and the transcript of the administrative hearing are made a part
of the record at Rec. Doc. 7-1.  Pages are numbered at the bottom right corner, and transcript
references will be made in this document as Tr. ___.

The Commissioner denied the application on May 25, 2010, and the claimant requested a hearing, which was held on January 5, 2011, before Administrative Law Judge ("ALJ") W. Thomas Bundy. [Tr. 27-39].  The ALJ rendered an unfavorable decision on July 18, 2011, finding that C.N.H. was not disabled under the Act's standard for child disability. [Tr. 10-22]. The claimant sought review with the Appeals Council, which denied review on October 19, 2012 [Tr. 1-3], making the ALJ's decision the Commissioner's final administrative decision for purposes of judicial review.

## STANDARD OF REVIEW

Any individual, after any final decision of the Commissioner of Social Security in which he was a party may obtain a review of the decision by a civil action. 42 U.S.C. 405(g).  This Court's review of the Commissioner's decision that the claimant is not disabled is limited to determining whether the decision was supported by substantial evidence and whether the proper legal standards were applied in reaching the decision.[2]  If the Commissioner's findings are supported by substantial evidence and the decision comports with relevant law, the decision must be affirmed.[3] Substantial evidence is such relevant evidence as a responsible mind might accept to

---

[2]      42 U.S.C. § 405(g); *Alfred v. Barnhart*, 181 Fed. App'x 447, 449 (5th Cir. 2006); *Boyd v. Apfel,* 239 F.3d 698, 704 (5th Cir. 2001);

[3]      *Carey v. Apfel*, 230 F.3d 131, 135 (5th Cir. 2000).

support a conclusion; it is more than a mere scintilla and less than a preponderance.[4] A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision.[5] Finding substantial evidence does not involve a search of the record for isolated bits of evidence that support the Commissioner's decision; instead, the entire record must be scrutinized as a whole.[6] In applying this standard, the court may not re-weigh the evidence or substitute its judgment for that of the Commissioner.[7]

## CHILDHOOD DISABILITY BENEFITS

An individual under the age of eighteen is considered to be disabled if he/she has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.[8]

---

[4]     *Boyd v. Apfel,* 239 F.3d at 704; *Carey v. Apfel*, 230 F.3d 131, 135 (5th Cir. 2000).

[5]     *Boyd v. Apfel,* 239 F.3d at 704.

[6]     *Singletary v. Bowen*, 798 F.2d 818, 823 (5th Cir. 1986).

[7]     *Boyd v. Apfel,* 239 F.3d at 704; *Carey v. Apfel*, 230 F.3d at 135.

[8]     42 U.S.C. § 1382c(a)(3)(C)(I); 20 C.F.R. § 416.906.

A three-step evaluative process is utilized to determine whether a person under the age of eighteen is disabled.[9]   At step one, it must be determined whether the claimant is engaging in substantial gainful activity.  A child claimant who is engaging in substantial gainful activity will be found not disabled regardless of his medical condition, age, education, or work experience.[10]   At step two, it must be determined whether the claimant has a medically determinable severe impairment or a combination of impairments that is severe.  A child found to have a slight abnormality or a combination of slight abnormalities that cause no more than minimal functional limitations will be found to be not disabled.[11]

At step three, it must be determined whether the claimant has an impairment or combination of impairments that meets or medically equals the criteria of a listing or that functionally equals a listing.[12]   When the impairments do not meet or equal a listed impairment, the Commissioner will evaluate the functional limitations caused by the child's impairments to determine whether they are disabling.[13]   To make the determination, the claimant's functioning must be assessed in terms of six domains:

---

[9]     20 C.F.R. § 416.924; *Lopez v. Barnhart*, 176 Fed. App'x 618, 619 (5th Cir. 2006).

[10]    20 C.F.R. § 416.924(b).

[11]    20 C.F.R. § 416.924(c).

[12]    20 C.F.R. § 416.972.

[13]    20 C.F.R. § 416.926a.

-4-

(1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for self; and (6) health and physical well-being.[14]  The assessment considers a comparison of how appropriately, effectively and independently the claimant performs activities compared to the performance of other children of the same age who do not have impairments.  To functionally equal the listings, the claimant's impairment or combination of impairments must  result in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain.[15]  A marked limitation is present where the impairment interferes seriously  with one's ability to "independently initiate, sustain, or complete activities."[16]  An extreme limitation is present where one's impairment "interferes very seriously with [one's] ability to independently initiate, sustain, or complete activities."[17]

### REVIEW OF THE ADMINISTRATIVE RECORD AND EVIDENCE

*The Administrative Record through the date of the hearing:*

---

[14]     20 C.F.R. § 416.926a(b)(1).

[15]     20 C.F.R. § 416.926a(b)(1), 416.926a(d).

[16]     20 C.F.R. § 416.926a(e)(2)(i).

[17]     20 C.F.R. § 416.926a(e)(3)(I).

Based on the historical information provided by her mother during the application process, C.N.H. speaks and understands English without difficulty.[Tr. 115]. She has no problems with vision or hearing. She completed eighth grade. [Tr. 120]. She has no limitations in her daily activities or her ability to communicate, understand and use what she has learned.  She likewise has no limitations of her physical abilities, social activities or behavior with others.  She is able to take care of her personal needs, she can pay attention and she can stick with a task. [Tr. 102-111]. According to her mother, C.N.H.'s alleged disabling illness is epilepsy which has disabled C.N.H.  since January 1, 2010. [Tr. 116].

From her early childhood, C.N.H. was treated by Dr. Fermin Blanco through the St. Martinville Maternal Child Clinic.  From late 2006 through January 5, 2009, he treated her for routine childhood illnesses. Records of her treatment during that time frame contain no references to seizure activity or suspected seizure activity. Historical information contained in other medical records suggest that C.N.H. received some mental health treatment during her early childhood for an ADHD condition.

On January 29, 2010, C.N.H. was seen in the emergency room of St. Martin Hospital for evaluation because she had taken 8-9 Advil "to stop the mess at school." [Tr. 204-05].  It was reported that friends had threatened to beat her up.  The records

document a history of prior counseling at a mental health clinic for a similar episode. Psychological counseling was recommended.  C.N.H. was seen by Cynthia Labiche, APRN, on March 16, 2010 who recommended therapy as well as medication with Lexapro. The family was in agreement with that treatment plan. [Tr. 532].

Three days later, on March 19, 2010, C.N.H. was again seen in the St. Martin Hospital emergency room with complaints of weakness and anxiety.  She had started her new medications but had not eaten breakfast or lunch,  She was instructed to continue her medications and to eat a good breakfast and lunch. [Tr. 206-09, 219, 271].  C.N.H. returned for emergency treatment at Lafayette General Medical Center the next day, March 20, 2010 [Tr. 220], at Womens and Childrens Hospital on March 21, 2010 [Tr. 185-193] and March 22, 2010 [Tr. 194-201], at St. Martin Hospital on March 27, 2010 [Tr. 279-282], at Iberia Medical Center on March 30, 2010 [Tr. 217, 287-300], and at Womens and Childrens Hospital on April 2, 2010 (2 visits) [Tr. 162-174].  On each visit, the child's mother described seizure-like episodes of short duration, followed by headaches and weakness.

A CT Scan was performed on March 20, 2010 which was interpreted as negative. [Tr. 185-86].  On March 21,2010, C.N.H. was observed in the hospital for over two hours with no seizure activity noted. [Tr. 186].  Labratory tests were normal or negative.  By March 22, 2010, a clinical impression/diagnosis of headache and UTI

-7-

was noted. [Tr. 195-96].   On March 26, 2010, C.N.H. was seen by pediatric neurologist, Dr. John Flatt, whose records document a normal EEG result. [Tr. 229]. Dr. Flatt noted that the reported symptoms seemed to have begun after the child started taking Lexapro.  He noted a history of headaches, depression and panic attacks and his notes include the reference "? of seizure not witnessed by health care provider." [Tr. 159].

On March 30, 2010, C.N.H. was taken to the emergency from her school where she had a seizure according to reports to EMS personnel. [Tr. 289].  Records of that visit include the diagnosis of acute seizure, history of new seizure disorder, acute UTI and Trich infection.  New medications and seizure precautions were prescribed which included restrictions from showering/cooking while home alone, operation of machinery or bicycle riding, avoidance of overexertion and emotional stress. [Tr. 217-18].   On the same date, C.N.H. returned to Cynthia Labiche, who adjusted her medications to discontinue the Lexapro and substitute Buspar.  Labiche recorded her assessment of severe single episode major depression; anxiety disorder NOS, and recommended a return in one month. [Tr. 531].

On April 2, 2010, C.N.H. returned to the emergency room at Womens and Childrens Hospital two separate times.  She reported three seizures that day.  She was unsteady in her walk; she was quiet, but answered questions; her headache had

resolved in one hour, and her speech and thoughts were clearer.  She reported she had discontinued her medications the night before. After her first discharge, she returned to the ER later in the day after a reported anxiety attack at WalMart.  She was again released in stable condition with the same discharge instructions given earlier in the day. [Tr. 162-174].

On April 14, 2010, Nurse Practitioner Amy Arceneaux documented her consultative evaluation of C.N.H. at the Kids Specialty Center. [Tr. 159-161].  The child and her mother gave a history of daily headaches since March 19, 2010 when C.N.H. had her first seizure.  The headaches were noted to be photophobic and phonophobic in nature, accompanied by blurred vision, weakness, and sweaty hands/feet. The only medication tried at that point to address the headache problem was Advil which was not effective.  The mother and child described approximately 10 separate seizure-like spells.  Since a recent change of medication to Topamax, there had been only two such spells.  The only medications C.N.H. was taking at that time were Topamax and Diastat PRN for seizures greater than 5 minutes.

On examination, the review of her systems was normal, as were the physical and neurological examinations, with the exception of a few hypopigmented lesions of her face. C.N.H. indicated that she occasionally felt weak when she ran.  C.N. H. had an EEG which was interpreted as normal. Arceneaux's diagnosis was epilepsy

NOS as well as headaches.  She recommended a vision screening and stressed the importance of eating three regular meals per day without skipping.  She ordered an MRI of the brain and increased the Topamax dosage.  She provided a letter for C.N.H.'s return to school and scheduled a 4-month follow-up.  On May 6, 2010, the MRI of the brain was reported as normal. [Tr. 227].

On June 13 and 14, 2010, C.N.H. was seen in the Womens and Childrens Hospital emergency room.  In the first visit, her mother reported C.N.H. had been unresponsive in the car for 30 seconds and had headaches since the day before. C.N.H. was alert and talking appropriately for her age on discharge. She was given Ibuprofen, instructed to continue with her current medications and to call Dr. Flatt's office the next day. [Tr. 436-446].  In the second visit, C.N.H. was taken by ambulance from school after what a teacher described as a grand mal seizure in class. She complained of acute headache, and the ER staff witnessed her shake and jerk, but she was verbally responsive and responsive to sternal rub. [Tr. 435]. Her medications were adjusted, and it was again recommended that she see  Dr. Flatt. [Tr. 448-452].

On June 17, 2010, C.N.H. visited the emergency room of Iberia Medical Center, reporting a seizure, which had resolved. Her mother reported multiple seizures in recent days.  No seizure activity was noted in the ER, and C.N.H. was

awake, alert, oriented and cooperative.  Laboratory tests indicated that her Topomax was at therapeutic levels for seizure control. [Tr. 340-350].

After two more emergency room visits at Womens and Childrens Hospital on July 10 (reported seizure while playing on computer) and July 11, 2010 (reported seizure in bed), C.N.H. was admitted for observation but was alert and in no distress. She was discharged the next day with instructions to continue her home medications including Topamax and Vimpat. [Tr. 459-474].  Dr. Flatt was asked to consult, and he ordered another EEG, which was normal, showing no indicators of an epileptic disorder.  He reported that C.N.H. was having spells of unclear etiology, which may represent refractory epilepsy and may be psychogenic in nature.  Her neurological examination was normal and he continued her medications but noted that she was not taking them. [Tr. 472].

On July 29, 2010 and again on August 8, 2010, C.N.H. returned to the emergency room at Iberia Medical Center with complaints of seizures. On both occasions, she expressed uncertainty about how to take her medications, and on both occasions, she was given instructions in that regard. On August 24, 2010, during a clinic visit at St. Martinville Maternal Child Clinic, C.N.H. had a brief episode where she fell back on the exam table, arching her body.  After the episode she complained

of a headache and stomach ache.  Her mother reported that her medications had recently been increased. [Tr. 393].

On September 29, 2010, C.N.H. was again admitted for observation at Womens and Childrens Hospital with complaints of five seizures over the previous two days each lasting 3-8 minutes. [Tr. 478].  An EEG performed on September 30, 2010 was interpreted as normal. [Tr. 481].   Doctors' notes indicate that the seizures were suspected to be psychogenic as opposed to epileptic.   C.N.H. was cleared for discharge with instructions to continue her medications and that she be referred for a psychological evaluation.  [Tr. 480].  On October 16, 2010, C.N.H. returned to the emergency room with complaints of four seizures every 15 minutes. No seizures were witnessed by emergency room personnel.  The medical records include handwritten questions regarding atypical seizures and possible hallucinations or other psychological components. [Tr. 488-497].  There are no other records of medical or psychological treatment or evaluation from October, 2010 to the date of the hearing on January 5, 2011.

*The Administrative Hearing:*

At the hearing C.N.H. appeared in person, with her mother, represented by a non-attorney senior paralegal.  C.N.H. testified that she was not in school as of the hearing date, having left school in ninth grade after she had a seizure on the school

-12-

bus. [Tr. 30].  She was assigned to homebound instruction after March, 2010. [Tr. 31].  She testified she could tell when she was going to have a seizure because her hands and feet got sweaty, her head started to pound, and her eyes started to hurt.  She testified she did not bite her tongue or wet herself during the seizures, and denied having such episodes at night while asleep. However, her mother disagreed. [Tr. 33-34].

Nalanaie H. Guidry, the child's mother testified that C.N.H. was receiving homebound instruction because she "can't quite stay at school, because I get called out a lot" and that the doctor recommended homebound instruction until further notice. [Tr. 31].  Ms. Guidry testified that C.N.H.'s last seizure was on New Year's Eve, while C.N.H. was talking with her cousin, and all of a sudden, "she went out." [Tr. 32].  Ms. Guidry said that typically, the child's hands got sweaty, she would start to act like she was agitated or fussy, and  then she passed out and went into a seizure that lasted about fifteen minutes. Afterward,  C.N.H. would be confused for about ten minutes. [Tr. 32].  Some episodes were worse than others, and Ms. Guidry described an incident when C.N.H. fell off the porch and "broke her hip and her toe" but she later clarified that the child had only "bruised" her hip. [Tr. 35-36].  According to Ms. Guidry, C.N.H. took her medications "exactly" as prescribed and did not miss a dose. [Tr. 33].  When she did attend school, C.N.H. had the services of a school nurse. [Tr.

-13-

37].  When she was at home, C.N.H. was not left unattended, and her medications were administered by Ms. Guidry or C.N.H.'s stepfather. [Tr. 38].

*The Supplements to the Administrative Record after the hearing:*

Other medical records that were submitted after the hearing and considered by the ALJ covered the treatment of C.N.H. through April 26, 2011.[18]   Three months after the hearing, on April 6, 2011, C.N.H. was seen by Cynthia Labiche for a mental health visit. [Tr. 529-530].  Her stepfather reported that since he understood the child's symptoms may be psych-related, they were appearing for a psychological evaluation.

Labiche noted C.N.H. was not compliant with therapy recommendations made over a year earlier and was not on seizure medications at the time of the visit.  C.N.H. reported  that she got so upset that she would start having shakes and could not control herself.  She described mood swings and stated she was easily agitated and argumentative.   Labiche documented a normal neurological exam, normal appearance, behavior, and attitude.   Thought processes and content were not impaired.  She noted C.N.H. had a sad affect and dysthymic mood swings.  She

---

[18]In his decision, the ALJ referenced records from April 26, 2010.  That appears to be a typographical error. [Tr. 529].

diagnosed questionable seizure activity, noting that C.N.H. was on and off her medications.

Correspondence from the claimant's representative indicated that C.N.H. was admitted to Acadia Vermilion Hospital for inpatient psychological treatment on April 18, 2011. [Tr. 533-543]. Records from that treatment had not been placed into the administrative record as of the date the ALJ issued his determination and are discussed further below.

On April 26, 2011, C.N.H. returned to see Cynthia Labiche, as recommended, and reported that since her inpatient treatment, she was doing "much better." She denied suicidal ideations, and her mood was happy. Her medications were continued and she was referred for therapy. She was counseled regarding proper use of medications and a follow up exam was set for the next month. Automatic medication refills were discontinued by Labiche, articulating "non-compliance" as the reason. [Tr. 529].

In addition to the medical records submitted by the claimant, the ALJ obtained additional input from other sources prior to issuing his decision. School records were obtained from Parks Middle School for the 2009-10 school year. [Tr. 125-127]. They revealed that C.N.H. missed 35 days of school during the year, with 17 unexcused, 12 excused by doctors or extenuating circumstances, 5 for suspensions, and 1

excused.  A Teacher Questionaire was completed by Linda Landry, who saw C.N.H. daily in the school setting. [Tr. 132-139].  She reported that C.N.H. had an eighth grade instructional level at school for reading, math and writing; she received no special education services.  No problems were observed by the teacher in the domains of acquiring and using information, comprehending oral instructions, understanding school vocabulary, reading/comprehending written material, math problems or class discussions.  C.N.H. likewise had no problems with providing organized explanations and adequate descriptions, expressing ideas in writing, learning new material, or recalling/applying previously learned material.  No problems were observed relative to attending and completing tasks and interacting and relating with others.  The same was true as to understanding speech, moving about and manipulating objects, and caring for herself.  The teacher indicated that it was not necessary to implement behavior modification strategies.  According to the teacher, a health plan was in place at the school for C.N.H.'s chronic seizures and frequent absences. [Tr. 138]. According to the teacher, the child's academics suffered as a result of those absences.

The ALJ also reviewed the findings by State Agency medical consultants relative to their mental and physical assessments in this case.  Judith Levy, Ph.D. (psychology) and Michael Halphen, MD (pediatrics) reviewed medical records and allegations of the claimant and completed the applicable Childhood Disability

Evaluation Forms which included domain evaluations based on the records reviewed. They concluded that C.N.H. did not have severe impairments which met or equaled a listed impairment. These results were considered and accepted by the ALJ. [Tr.13].

Following the hearing, a Report of Evaluation of Records was obtained from Dr. George Smith who reviewed medical exhibits 1F-25F and responded to medical interrogatories regarding C.N.H. [Tr. 498-518].  In a written report of March 15, 2011[Tr. 498-99], Dr. Smith noted the diagnoses by Drs. Blanco and Flatt of seizure disorder.  However, he also noted that multiple EEG tracings showed no epileptiform activity, and MRI imaging studies showed no abnormalities.  He pointed to the multiple emergency room visits for seizures, few of which showed post-ictal findings on examination and the fact that no seizures were observed by medical personnel, with perhaps one observed at school.  No seizure logs were kept, and actual office notes from the doctors were noted to be scant.  Although a reference was made to a referral to New Orleans for evaluation and treatment, there was no record of follow through.  Further, Dr. Smith noted that the Dr. Flatt was uncertain in his diagnosis, describing it to be "refractory epilepsy or seizures of psychogenic origin."  Though Dr. Flatt felt that a psychological evaluation should be done, those recommendations were not carried out as of the date of Dr. Smith's report.  Dr. Smith did not feel that C.N.H.'s condition either met or equaled the epilepsy listings.  Given the unresolved

-17-

questions as to compliance with medications, Dr. Smith recommended that seizure precautions be maintained.

In responding to the medical interrogatory relative to child patients [Tr. 510-516], Dr. Smith opined that there was sufficient objective medical and other evidence to allow him to form opinions about the nature/severity of C.N.H.'s impairments.  He did not think the records substantiated a diagnosis of seizure disorder. [Tr. 513]. He specifically addressed the requisite six domain evaluations, finding no limitations in domains 1, 2, 3, and 5.  In the fourth domain of moving about and manipulating objects, he found that C.N.H. had less than marked limitation, based on the seizure precautions in place until a complete diagnosis could be made.  The same finding, for the same reason, was made as to the sixth domain of health and physical well-being. [Tr. 515-516].

## THE DETERMINATION OF THE ALJ

At step one, the ALJ found that C.N.H. had not engaged in substantial gainful activity at any relevant time. [Tr. 13].  This finding is supported by the record and uncontested by the claimant. At step two, the ALJ found that C.N.H. has the severe impairments of epilepsy and anxiety (20 C.F.R. § 416.924(c)). [Tr. 13].   This is supported by the evidence in the record.

-18-

At step three, the ALJ found that C.N.H. does not have an impairment or combination of impairments that meets or equals a listed impairment in 20 CFR Part 404, Subpart P, Appendix 1(20 C.F.R. § 416.924, 416.925 and 416.926). [Tr. 13]. He likewise found that C.N.H. does not have an impairment or combination of impairments that functionally equals the listings, since C.N.H.'s impairments do not cause marked limitations in two domains or extreme limitation in one domain. [Tr. 14]. Specifically, the ALJ found that C.N.H. has no limitation in acquiring and using information and attending/completing tasks, she has no limitation in interacting and relating with others, she has less than marked limitation in moving about and manipulating objects, she has no limitation in the ability to care for herself, and she has less than marked limitation in health and well-being. [Tr. 14-19].

The ALJ found that the claimant's allegations are consistent with the objective medical records to document the presence of a severe impairment that could reasonably be expected to produce C.N.H.'s reported symptoms. However, he also found that the claimed level of intensity, persistence and functionally limiting effects of the symptoms were not well-supported by the current clinical findings or the longitudinal medical evidence. Overall, he found the claimant's allegations to be only "partially credible." [Tr. 22]. Accordingly, the ALJ found that C.N.H. has not

been disabled, as the term is defined in the Social Security Act, since the date of application for benefits. [Tr. 22].

## ASSIGNMENT OF ERRORS

The claimant contends that (A) the record supports the presence of an extreme limitation in the domain of 'Health and Well Being; (B) the ALJ failed to fulfill his duty to develop the facts, resulting in prejudice; (C) the ALJ failed at Step Two to identify the claimant's medically determinable impairments, major depressive disorder, single episode or headaches as severe or non-severe impairments, and he did he follow the *Stone v. Heckler* standard; and (D) the Appeals council failed to follow its own policies/procedures regarding receipt of new and material evidence. [Rec. Doc. 12].

## ANALYSIS AND DISCUSSION

*The Record is not Adequately Developed*

The ALJ owes a duty to a claimant to develop the record fully and fairly to ensure that his decision is an informed decision based on sufficient facts.  Further, it is the ALJ's duty to investigate the facts and develop the arguments for and against granting benefits.[19]   However, the claimant has the duty to obtain and produce

---

[19]*Sims v. Apfel*, 530 U.S. 103, 111 (2000).

-20-

medical records and documentation showing that he/she is disabled.[20]   It is not unreasonable to require a claimant, who is in a better position to provide information about his/her own condition, to do so.[21]   It is not the ALJ's duty to become the claimant's advocate.[22]

At all times pertinent, the claimant was represented by a senior paralegal who actively participated in the hearing of the matter, and made multiple post-hearing submissions of records for consideration by the ALJ and the Appeals Council.  The ALJ also acted to gather additional information for use in his decision-making process.  He sought input from school personnel and the medical consultant Dr. George Smith for evaluation of the medical record and consideration of the evidence. These actions are fairly characterized as earnest efforts by the ALJ to develop the record.  However, some of the information obtained at and following the hearing in January, 2011, warranted additional action.

In March, 2011, Dr. Smith focused on the following inadequacies in the record: the absence of a clear diagnosis relative to C.N.H.;  the uncertainty expressed by the child's treating physician regarding a proper diagnosis, and the physician's

---

[20]*Brock v. Chater*, 84, F.3d 726, 728 (5th Cir. 1996); *Thorton v. Schweiker*, 663 F.2d 1312, 1316 (5th Cir. 1981).

[21]*Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987).

[22]*See Glass v. Shalala*, 43 F.3d 1392, 1396 (10th Cir. 1993).

-21-

recommendation for further psychological testing and evaluation.  Dr. Smith also suggested that his own domain analyses, offered at the ALJ's request, were influenced by the uncertainty about C.N.H.'s seizure condition and his anticipation that additional evaluation would/should be done.  While Dr. Smith opined that C.N.H.'s condition did not meet or equal the listings for epilepsy, he could offer little more, by his own admission:

> It appears to me that Dr. Flatt has questions as to the nature of her "seizures" and that these questions have not been resolved.  There are questions as to her compliance with her medications and there is but one determination of Topomax serum levels that I could find.  I do feel that seizure precautions should be maintained for the present until this matter is further resolved. [Tr. 498].

As Dr. Smith suggested, the record considered by the ALJ in issuing his decision presented more questions than answers regarding the appropriate diagnosis for the claimant.  The Court finds, in the minimal records of Dr. Flatt, a single handwritten recommendation to "Refer for psych." on September 30, 2010. [Tr. 480].  Recommendations for psychological counseling appear in the record beginning in January, 2010 [Tr. 205], and C.N.H was seen for a mental health initial visit with Cynthia Labiche on March 16, 2010. [Tr. 532]. Labiche also recommended counseling, and she saw the child again at the end of the month, but they did not visit again for one year, at which time Labiche noted that the patient had not returned for

followup and was considered noncompliant. [Tr. 530].   On May 3, 2011, supplemental records of office visits with Cynthia Labiche were provided for the period from March 16, 2011 through April 26, 2011. In the cover letter by the claimant's representative enclosing those records, it was suggested that "Dr. Labiche" is a psychologist. [Tr. 151]. She is not.  Ms. Labiche is an Advanced Practice Registered Nurse (APRN), and her records were thus not considered by the ALJ to be from an acceptable medical source. [Tr. 20]. Nevertheless, the ALJ considered Labiche's records, including reports of each of her visits with C.N.H. through April 26, 2011. [Tr. 21].

Also referenced in the May 3, 2011 cover letter was information that C.N.H. had been admitted to Acadia Vermilion Hospital since the hearing date.  Records of that admission were to be provided, but they were not in the record at the time of the issuance of the ALJ's decision, although the ALJ had notice of their existence.  The records were not placed into the administrative record until September 9, 2011, some nine months after the hearing, five months after the referenced treatment, and two months after the ALJ's decision. [Tr. 153]. Thus, it is clear that at the time the ALJ decision was issued, no psychological testing or evaluation had been obtained, and the diagnoses of the child's treating physicians remained confused and unclear.

Social Security proceedings are inquisitorial rather than adversarial[23], and the ALJ must fully and fairly develop the facts relating to a claim before making a disability determination.[24]   The ALJ has discretion to decide whether to require a claimant to undergo a consultative examination.[25]   When the ALJ is unable to make a disability determination based on the medical evidence in the record, and the claimant has presented evidence sufficient to raise a suspicion concerning a non-exertional impairment,[26] the ALJ is required to order a consultative evaluation.[27] When "the existing medical evidence is inadequate to make an informed disability determination, the Commissioner has a duty to develop the record by recontacting a claimant's medical sources or by referring the claimant for a consulting exam."[28]   If the ALJ does not have before him sufficient facts on which to make an informed decision, his decision is not supported by substantial evidence.[29]

---

[23]      *Sims v. Apfel* 530 U.S. 103, 120, 120 S.Ct. 2080, 147 L.Ed.2d 80 (2000).

[24]      *Carey v. Apfel*, 230 F.3d 131, 142 (5th Cir. 2000).

[25]      *Jones v. Bowen*, 829 F.2d 524, 526 (5th Cir. 1987).

[26]      *Jones v. Bowen*, 829 F.2d 524, 526 (5th Cir. 1987).

[27]      *Turner v. Califano*, 563 F.2d 669, 671 (5th Cir. 1977).

[28]      *Jessee v. Barnhart*, 419 F.Supp.2d 919, 933-34 (S.D. Tex. 2006).

[29]      See *Long v. Richardson*, 334 F.Supp. 305 (W.D.Va., 1971), cited in *McGee v. Weinberger*, 518, F.2d 330 (5th Cir. 1977).

In this case, with the medical declarations by Drs. Flatt and Smith that they could not make a clear diagnosis and with both recommending further evaluation, it is the finding of the this Court that the ALJ could not make a full and fair assessment of disability.  The Court finds that the claimant has raised the requisite suspicion that further examination and evaluation is necessary for the ALJ to discharge his duty of full inquiry.[30]

Mindful that the role of this Court in reviewing the decision of the ALJ is limited, it is the finding of the undersigned that this case falls within that limited area defined by *McGee v. Weinberger*, 518 F.2d 330 (5th Cir. 1977), and it must be remanded, under §405(g) for additional evidence which should include the results of the long-recommended consultative psychological evaluation, inquiring into possible psychogenic causes for the claimant's symptoms, and otherwise addressing the questions raised by the claimant's treating physicians.  While it is impossible to know what such an evaluation may show, it is reasonable to believe that such an evaluation, had it been done before the ALJ decision, "could and would have adduced evidence that might have altered the result."[31]

---

[30]    See *Pearson v. Bowen*, 866 F.2d 809, 812 (5th Cir. 1989).

[31]    *Brock v. Chater*, 84 F.3d 726, 728 (5th Cir. 1996) (citing *Kane v. Heckler*, 731 F.2d 1216, 1220 (5th Cir. 1984).

*The Records Submitted to the Appeals Council Support Remand*

Social Security regulations provide that if new and material evidence is submitted to the Appeals Council after the ALJ has already rendered a decision, "the Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision." 20 C.F.R. § 404.970(b).  The Appeals Council must then "evaluate the entire record including the new and material evidence." 20 C.F.R. § 404.970(b).  If the Appeals Council "finds that the administrative law judge's action, findings, or conclusion is contrary to the weight of the evidence currently of record," then the Appeals Council is required to "review the case." 20 C.F.R. § 404.970(b).

In its notice, the Appeals Council expressly stated that it had considered the claimant's post-decision brief of September  9, 2011(Ex. 12E) and the medical records from Acadia Vermilion Hospital dated April 18, 2011 to April 22, 2011(Ex. 29F). [Tr. 7-8].   The undersigned has located no authority that a detailed explication of any new and material evidence must be articulated by the Appeals Council in its notice of the action taken  in order to satisfy the requirement that the new evidence be evaluated.  When the Appeals Council considers new evidence but declines to review the case, and an appeal is filed, this Court must review the ALJ's decision and determine whether there is substantial evidence in the record,

which now includes the new evidence submitted after the hearing, to support the

ALJ's decision.[32]  Consequently, any error by the Appeals Council may be

remedied by judicial review.

The subject records indicate that C.N.H. was admitted to Acadia Vermilion

Hospital, "for acute stabilization and observation" [Tr. 537], after the report that

she had "overdosed on seizure medicine." [Tr. 535].  C.N.H. reported that she was

stressed by bullies at school; that she could not stay in school because of seizures;

that she had poor sleep and appetite and felt hopeless since August. [Tr. 539]. The

past diagnoses of major depression were noted from the visits with Cynthia

Labiche.

C.N.H. was noted to be calm, pleasant, and cooperative on mental status

examination, with average intelligence.  Her psychomotor exam was normal, as

were her speech and thought processes.  She had an anxious affect, sad mood,

thoughts of hopelessness and severe depression. [Tr. 542-43].  A Discharge

Diagnosis was recorded by Dr. Nicole Dickens as Axis I-Major depressive

disorder Recurrent Severe; Axis II deferred; Axis III seizure disorder, allergies;

---

[32]     *Higginbotham v. Barnhart*, 405 F.3d 332, 334 (5th Cir. 2005); *Nelson v. Sullivan*, 966
F.2d 363, 366 (5th Cir. 1992); *Browning v. Sullivan*, 958 F.2d 817, 823 (8th Cir. 1992); *Wilkins v.
Sec'y, Dep't of Health & Human* Services, 953 F.2d 93, 96 (4th Cir. 1991).

Axis IV school, social; Axis V-Discharge GAF 58.[33]  Prognosis was noted to be good. [Tr. 537, 543].  At discharge, symptoms were noted to be improved; C.N.H. was noted to be goal-directed, with euthymic mood, improved insight and stable condition.  She was urged to follow up with Cynthia Labiche. [Tr. 537].

While there is a psychological diagnosis by a mental health professional from this inpatient treatment, that diagnosis does not necessarily resolve the questions raised by the claimant's physicians or Dr. Smith. It is also not clear whether the psychological diagnosis of Dr. Dickens pre-dated this admission, and if so, to what degree the diagnosed condition  may have impacted the factors the ALJ is required to consider. Thus, these records do not change the need to fully develop the record.

## CONCLUSION AND RECOMMENDATION

It is well-established that "the ALJ has sole responsibility for determining a claimant's disability status."[34]  As discussed above, this Court's standard of review

---

[33]The Global Assessment of Functioning (GAF) is a numeric scale (0 through 100) used by mental health clinicians and physicians to rate subjectively the social, occupational, and psychological functioning of adults, e.g., how well or adaptively one is meeting various problems-in-living. The scale is presented and described in the DSM-IV-TR on page 34. The score is often given as a range.  The range from 51 - 60 indicates Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

[34]     *Moore v. Sullivan*, 919 F.2d 901, 905 (5th Cir. 1990).

is (1) whether substantial evidence of record supports the ALJ's determination, and (2) whether the decision comports with relevant legal standards.[35]  This Court may not issue factual findings on the new evidence, since this Court's review of such evidence is limited to determining whether to remand to the Commissioner for consideration of the newly-presented evidence.  See 42 U.S.C. §405(g).

Since the Court has determined that the ALJ's decision is not supported by substantial evidence, based on the failure to adequately develop the record with a physician-recommended psychological evaluation, it is RECOMMENDED, consistent with provisions of 42 U.S.C. §405(g) and 20 C.F.R. § 404.970(b), this case should be REVERSED and REMANDED for consideration of the entire record, including the results of the recommended consultative evaluation, and the evidence submitted after the ALJ decision, and other appropriate action that may result.[36]

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen days from receipt of this report and recommendation to file specific, written objections with the

---

[35]     *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990).

[36]Because the undersigned recommends that the matter should be remanded for consideration of other evidence as discussed above, the Court need not consider the claimant's other assignments of error at this time.

Clerk of Court.  A party may respond to another party's objections within fourteen days after receipt of a copy of any objections or responses to the district judge at the time of filing.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of receipt, or within the time frame authorized by Fed. R. Civ. P. 6(b) shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the district court, except upon grounds of plan error.  See *Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996).

Signed in Lafayette, Louisiana, this 5th day of August, 2014.

_____
Patrick J. Hanna
United States Magistrate Judge

-30-